UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

MICHAL DILLON,

                Plaintiff,

– against –

NED MANAGEMENT, INC., YACOV
FRIDMAN, ERIC VAINER, POLINA
VAINER, JOE MILLIGIAN,

                Defendants.

| Parties | Appearances |
|---|---|
| Michal Dillon | Marjorie Mesidor<br>Nicole Ann Welch<br>Phillips PLLC<br>45 Broadway, Suite 620<br>New York, NY 10006<br>(212) 248-7431<br>mmesidor@tpglaws.com<br>nwelch@tpglaws.com |
| Ned Management, Inc.<br>Yacov Fridman<br>Eric Vainer<br>Polina Vainer<br>Joe Milligan | John J.P. Howley<br>Law Offices of John Howley<br>350 Fifth Avenue, 59th Floor<br>New York, NY 10118<br>(212) 601-2728<br>jhowley@johnhowleyesq.com |

JACK B. WEINSTEIN, Senior United States District Judge:

## Table of Contents

I.    Introduction ................................................................................................................. 3
II.   Facts .......................................................................................................................... 4
      A.   Dillon's Employer .............................................................................................. 4
      B.   Dillon's First Six Months on the Job ................................................................. 5
      C.   Fridman's Unwanted Sexual Advances ............................................................. 6
      D.   Dillon Lodges Informal Complaint with Milligan and Mr. Vainer against Fridman ........ 8
      E.   Inadequate "Investigation" by Fridman's Stepson Follows Dillon's Complaint............... 8
      F.   At the Direction of Mrs. Vainer, Dillon Is Not Paid for Working on the Day Fridman
           Allegedly Touched Her Buttock .......................................................................... 9
      G.   Dillon Is Fired ................................................................................................. 10
III.  Summary Judgment Standard ................................................................................ 11
IV.   Law .......................................................................................................................... 12
      A.   Applicable Statutes and Rules of Construction ............................................... 12
           1.   Title VII ................................................................................................... 12
           2.   NYCHRL ................................................................................................. 13
      B.   Hostile Work Environment ............................................................................... 16
           1.   Title VII ................................................................................................... 16
                a.   Severity or Pervasiveness of Harassment ...................................... 17
                b.   Imputing Conduct That Created Hostile Work Environment to Employer............... 18
                c.   Affirmative Defense ........................................................................ 19
           2.   NYCHRL ................................................................................................. 20
                a.   Direct Liability of Employer ............................................................ 21
                b.   Direct Liability of Individual Employees ......................................... 21
                c.   Aider and Abettor Liability ............................................................. 22
      C.   Retaliation ........................................................................................................ 23
           1.   Title VII ................................................................................................... 23
                a.   Plaintiff's Burden:  Prima Facie Case ............................................ 23
                     i.    Engagement in Protected Activity .......................................... 24
                     ii.   Employer's Awareness of Protected Activity ......................... 24
                     iii.  Adverse Employment Action .................................................. 25
                     iv.   Causal Connection Between Adverse Action and Protected Activity ............... 26
                b.   Employer's Burden:  Non-Retaliatory Reason for Employment Action ............... 26
                c.   Plaintiff's Renewed Burden:  Assessing Whether Employer's Stated Reason is
                     Pretextual .......................................................................................... 27
           2.   NYCHRL ................................................................................................. 27
                a.   Direct Liability of Employer ............................................................ 28
                b.   Direct Liability of Individual Employees ......................................... 29
                c.   Aider and Abettor Liability ............................................................. 29
V.    Application of Law to Facts.................................................................................... 30
      A.   Hostile Work Environment ............................................................................... 30
           1.   Title VII Claim against Defendant Ned Management.............................. 30
           2.   NYCHRL Claims against Defendant Ned Management and Individual Defendants 32

      a.    Direct Liability against Defendant Ned Management ............................................... 32
      b.    Direct Liability against Individual Defendants ...................................................... 32
      c.    Aider and Abettor Liability against Individual Defendants ..................................... 33
  B.   Retaliation ..................................................................................................................... 33
    1.    Title VII Claim against Defendant Ned Management ............................................... 33
    2.    NYCHRL Claims against Defendant Ned Management and Individual Defendants 35
      a.    Direct Liability against Defendant Ned Management ............................................... 35
      b.    Direct Liability against Individual Defendants ...................................................... 36
      c.    Aider and Abettor Liability against Individual Defendants ..................................... 36
VI.   Conclusion ......................................................................................................................... 37

## I.    Introduction

Plaintiff contends that the docking of her pay and her termination occurred because she accused one of her bosses, defendant Yacov Fridman, of making unwanted sexual advances toward her.  She was employed as a secretary, front-desk attendant, and nerve conduction technician at defendant Ned Management, Inc. ("Ned Management" or "the company"), a family-run management services organization for doctors, which operates out of various locations in New York City.

Defendant Joe Milligan, Dillon's immediate supervisor, and defendant Eric Vainer ("Mr. Vainer"), the owner of the company, she charges, largely ignored her when she complained about Fridman's behavior.  Mr. Vainer, considering the accusations about his stepfather to be false, told Dillon to "get an attorney."  Defendant Polina Vainer ("Mrs. Vainer"), the bookkeeper of the company and mother of Mr. Vainer, it is alleged, docked Dillon's pay in retaliation for lodging an informal complaint against Fridman—referred to by the parties as Mrs. Vainer's common-law husband.

Advancing theories of hostile work environment, retaliation, and aiding and abetting the creation of a hostile work environment and retaliation, Dillon sues Ned Management, Milligan, the Vainers, and Fridman under a combination of federal and city laws.  *See* Title VII of the Civil

Rights Act of 1964 ("Title VII"), 42 U.S.C.A. § 2000e-2(a), (3)(a) (West 2012); New York City

Human Rights Law, N.Y.C. Admin. Code ("NYCHRL"), § 8-107(1), (6), (7) (West 2012).

Fridman, uniquely, is sued for sexual assault and battery.

Defendants insist that Dillon's incessant lateness—and nothing more—resulted in her

firing.

Defendants' motion for summary judgment is denied. Plaintiff's hostile work

environment and retaliation claims against Ned Management will proceed to trial under Title VII

and NYCHRL. Hostile work environment and retaliation claims, including claims for aiding and

abetting these civil rights violations, will proceed against the Vainers and Fridman under

NYCHRL. A hostile work environment claim and a corollary aiding and abetting claim will

proceed against Milligan. A state assault and battery claim against Fridman will be joined.

## II. Facts

The evidence favoring plaintiff suggests the following scenario:

### A. Dillon's Employer

Dillon was employed by Ned Management, a small, family-run, billing, bookkeeping, and

credentialing management services organization for doctors, from February 10, 2012 until

October 10, 2012. (E. Vainer Dep. Tr. 19:23–20:3, 55:20–56:4, 66:15–67:17, 187:24–25, ECF

No. 57-3; P. Vainer Dep. Tr. 26:20–27:23, ECF No. 57-4.) Mr. Vainer hired Dillon to perform

the duties of a secretary, front desk attendant, and nerve conduction technician. (*Id.* at 59:15*;*

Milligan Dep. Tr. 35:17–18, ECF No. 57-5.) Her job responsibilities included managing patient

information and scheduling patient appointments with various doctors. (Milligan Dep. Tr.

35:21–22.) For the first ninety days of her employment, Dillon was paid $15.00 per hour.

(Dillon Decl. ¶ 5, ECF No. 56). After this probationary period, she was paid $17.50 per hour.

(*Id.*; E. Vainer Dep. Tr. 123:22–23.)  As a full-time employee, she was hired to work approximately thirty hours per week.  (Dillon Decl. ¶ 18; Gueten Aff. ¶ 7, ECF No. 51-9.)

### B. Dillon's First Six Months on the Job

Her first six months of employment were without incident or complaint; no problems arose with respect to her working environment or her colleagues.  (Dillon Dep. Tr. 63:9–16, ECF No. 57-1.)  Often arriving to work around 9:00 a.m., she prioritized responding to the immediate needs of clients before formally clocking-in.  (Dillon Decl. ¶19.)  She "rarely punched in immediately after [she] got to the office because [she] needed to boot up [her] computer and log in to the punch-in system."  (*Id.*)  "On some days, the computer system wasn't working properly so [she] couldn't clock in right when [she] arrived."  (*Id.*)  During these months, she never received any warnings from her supervisors that she needed to clock-in immediately upon entering the building.  (E. Vainer Dep. Tr. 188: 2–9; Dillon Decl. ¶ 51.)

Her encounters with defendant Fridman, who was tasked with transporting documents between Ned Management facilities, were few; the two rarely exchanged more than formal pleasantries.  (Dillon Dep. Tr. 70:23–71:5; Fridman Dep. Tr. 54:20–24, ECF No. 57-2.)

Cognizant of Fridman's familial ties to her bosses, Dillon considered Fridman to be her "superior."  (Dillon Dep. Tr. 63:19–20 ("He was or is the boss's husband. . . .  I thought of him as my superior.").)  Publicly referring to Mrs. Vainer as his wife and functioning as Mr. Vainer's stepfather, Fridman had been a part of the Vainers' lives for twenty-five years.  (P. Vainer Dep. Tr. 8:9–11; E. Vainer Dep. Tr. 170:14–171:8 (Counsel: "Do you love Mr. Fridman?" E. Vainer: "Yes.").)  At Ned Management, Fridman delivered essential documents to Dillon, including her weekly paycheck, and required her to transport documents to his car when he called and requested assistance.  (Dillon Decl. ¶¶ 25–27; Dillon Dep. Tr. 64:17–23; Milligan Dep. Tr.

139:4–14; Fridman Dep. Tr. 42:15–20.)  Fridman testified:  "I don't have to ask [for the assistance of Ned Management employees].  They know they gotta help me."  (Fridman Dep. Tr. 66:3–4.)

## C. Fridman's Unwanted Sexual Advances

Fridman's behavior toward Dillon abruptly changed in August 2012.  (Dillon Dep. Tr. 63:12–73:22.)  On August 17, while delivering paperwork to Fridman on the street outside of the building where she worked, Fridman told Dillon, "[Y]ou have nice titties," and then—offering her cash—asked if he could "see them."  (*Id.* at 65:2–4; Dillon Decl. ¶¶ 24, 27.)  Shocked, she responded, "Have a good day," abruptly leaving.  (Dillon Dep. Tr. 65:4–5.)

Uncomfortable, dejected, and unsure about what to do next, she discussed the incident with Carmen Gueten, a non-Ned Management front desk attendant with whom Dillon shared responsibilities.  (Dillon Decl. ¶ 28; Gueten Aff. ¶¶ 3–4, 10–11.)  Later that evening, Dillon spoke with her friend Iasia Wright, another non-employee of Ned Management.  (Dillon Dep. Tr. 65:23–66:1.)  Wright told Dillon to "brush off [Fridman's lewd comment] and not think about it too much."  (*Id.* at 66:2–67:2.)

Five days later, on August 22, Fridman approached Dillon again.  (*Id.* at 69:12–70:6.)  This time, he told her to show him her office.  (*Id.* at 69:19)  She complied.  (*Id.*)  Entering the hallway, Fridman waived four $100 bills in her face, saying: "I know you need some extra cash. . . . [T]his could be yours."  (*Id.* at 68:24–70:6.)

Trying to brush off this second unwelcome sexual advance, plaintiff rushed back to the front desk.  (*Id.* at 69:23–24.)  There, Dillon complained to Ned Management coworker Jennifer Marrero.  (*Id.* at 71:22–23.)  In response, Marrero told Dillon that, in the past, Fridman had made inappropriate sexual remarks to her as well.  (*Id.* at 71:23–72:7; *cf.* E. Vainer. Dep. Tr. 85:12–20

(Counsel: "Did you ask [Marrero] any questions about how comfortable she was with Mr. Fridman?" E. Vainer: "No, because they worked in the same room for two years with each other in a room smaller than this . . . So why would I ask her that question?").) Marrero never complained because she feared being fired would result. (Dillon Decl. ¶ 32; *see also* Online Chat Exchange between Dillon and Marrero 2–3, ECF No. 57-8.)

In December 2012, almost two full months after Dillon's termination, days after Dillon had filed a formal complaint against Ned Management, at the request of Mr. Vainer, Marrero signed an affidavit stating that Fridman had "always treated [her] in a professional and respectful manner." (Marrero Aff. ¶ 1, ECF No. 51-2; E. Vainer Dep. Tr. 105:21–25.) Similar affidavits were drafted and signed by other Ned Management employees at the request of Mr. Vainer during this period. (E. Vainer Dep. Tr. 106: 10–21.) The validity of Marrero's affidavit is questioned since it was requested by Mr. Vainer under circumstances when Marrero's fear of termination would have been heightened.

For the rest of August and through September, Dillon had no further uncomfortable exchanges with Fridman. (Dillon Dep. Tr. 72:15–18.) Then, on October 1, Fridman requested plaintiff's help loading his car with paperwork to be transported to another Ned Management facility. (Dillon Decl. ¶ 33; Dillon Dep. Tr. 73:6–7; Fridman Dep. Tr. 37:21–38:4, 47:20–48:5.) Dillon nervously complied, understanding that she had no choice. (Dillon Decl. ¶ 33; Fridman Dep. Tr. 66:3–4 ("I don't have to ask [for the assistance of Ned Management employees]. They know they gotta help me.").) As she was placing paperwork on the floor of the backseat of Fridman's car, he grabbed her buttock. (Dillon Dep. Tr. 73:9–11.) Standing up, plaintiff stared at Fridman. (*Id.* at 73:12.) Neither exchanged a word. (*Id.* at 73:23–74:1.) On her walk back to the office, she started crying. (Dillon Decl. ¶ 35.) Observing a shaken and visibly upset Dillon,

Gueten urged her to complain to Mr. Vainer about the sexual harassment.  (Gueten Aff. ¶¶14–17.)

### D.  Dillon Lodges Informal Complaint with Milligan and Mr. Vainer against Fridman

That same day, despite her fear that lodging a complaint would put her job in jeopardy, and compromise her ability to support her young son, Dillon informed her immediate supervisor, Milligan, about Fridman's behavior.  (Dillon Decl. ¶¶ 28, 35, 38; Dillon Dep. Tr. 42:24–43:3, 62:21–23, 76:11–18, 78:23–79:3; Milligan Dep. Tr. 36:25–37:4, 53:7–8, 81:23–25.)  Milligan, believing "[t]here was nothing to do" after this conversation, did not press Dillon any further about the situation and did not conduct any formal follow-up investigation.  (Milligan Dep. Tr. 49:16–22, 55:15–16.)

The next morning, Dillon called Mr. Vainer to report Fridman's behavior.  (Dillon Decl. ¶¶ 41–42; Dillon Dep. Tr. 78:10–79:15.)  Mr. Vainer brushed her off.  (Dillon Decl. ¶ 42.)  Lending no credence to the accusations about his stepfather, he informed her that she had "better get an attorney."  (E. Vainer Dep. 79:23–24, 171:17–21.)

### E.  Inadequate "Investigation" by Fridman's Stepson Follows Dillon's Complaint

After speaking to Dillon, Mr. Vainer called Fridman.  (*Id.* at 80:7–9.)  Mr. Vainer described the exchange between the two as follows:

> E. Vainer:  "I said, 'Dillon just called accusing you of touching her in the wrong place.' And he just said, 'What?' . . ."
>
> Counsel:  "What else did he say?"
>
> E. Vainer:  "That's it . . . He said, 'No' . . . I said, 'Okay.'"

(*Id.* at 81:8–17.)

After this brief conversation, which lasted no more than three minutes, Mr. Vainer went to Dillon's Ned Management location to speak to others.  (*Id.* at 81:4–82:12, 82:6–12.)  During

an "investigation" lasting no more than 30 minutes, Mr. Vainer recalled separately pulling eight

to ten individuals into a small treatment room and asking each the same singular question: "Did

you see Yakov touching Dillon?" (*Id.* at 84:19–24, 84:11–14, 87:18–19.) Each answered "no";

Mr. Vainer pressed no further. (*Id.* at 85:12–15, 89:7–9, 93:4–6.) Only Mr. Vainer and the

individual being questioned were present during these undocumented "interviews." (*Id.* at

92:10–21, 98:5–7.)

Inconsistencies surround defendants' accounts of Dillon's accusation and the

"investigation" that followed. Milligan, for example, testified that he was unaware of any

investigation. (Milligan Dep. Tr. 36:25–37:3, 114:19–115:9.) Mrs. Vainer too claimed she was

oblivious of any investigation. (P. Vainer Dep. Tr. 51:16–25, 67:12–22.) Contradicting her son,

she said she was only made aware of Dillon's accusation about Fridman after she received the

complaint in the instant case in the mail. (*Compare* P. Vainer Dep. Tr. 51:16–25 *with* E. Vainer

Dep. Tr. 99:24–100:11, 138:2–13.)

**F.  At the Direction of Mrs. Vainer, Dillon Is Not Paid for Working on the Day
     Fridman Allegedly Touched Her Buttock**

On October 3, 2012, payday, Dillon noticed that her pay had been docked by seven

hours; she was not paid for working October 1, 2012—the day Fridman had allegedly grabbed

her. (Dillon Decl. ¶¶ 44–45; P. Vainer Dep. Tr. 39:4–47:9; E. Vainer Dep. Tr. 192:16–197:19.)

Payroll informed her that the instruction to dock her pay had come directly from Mrs. Vainer.

(P. Vainer Dep. Tr. 14:6–11, 27:11–28:20; Shabat Dep. Tr. 12:12–19, 17:18–18:8, 19:7–13, ECF

No. 57-6.) Mrs. Vainer denies the allegation, but presents no alternative reason for the pay cut,

which she acknowledges occurred. (P. Vainer Dep. Tr. 51:10–15.)

### G. Dillon Is Fired

Seven days after receiving the reduced paycheck, on October 10, 2012, Dillon was fired. (Milligan Dep. Tr. 134:11–20.) On that day, Dillon had called Mr. Vainer to complain about not being paid for October 8, Columbus Day. (Dillon Decl. ¶ 50.) Mr. Vainer maintained in his deposition that this phone call, which he characterized as offensive, along with Dillon's consistent lateness, led to his termination decision. (E. Vainer Dep. Tr. 171:25–172:11, 181:7–25.) Denying the existence of a company "write-up" form for "insubordination" and/or "tardiness," he was unable to recall any specific conversations with Dillon about her lateness. (*Id.* at 187:21–25, 181:7–25.) Milligan, however, testified to the existence of a "write-up" form and confirmed that one had never been filled out for Dillon. (Milligan Dep. Tr. 142:10–24, 143:4–7.)

According to Dillon, her firing went unexplained; Mr. Vainer allegedly told her only that she was "too much trouble," never mentioning lateness or work performance issues. (Dillon Decl. ¶ 50.)

The sexual harassment she faced, Dillon claims, led to depression, anxiety, and difficulty sleeping. (*Id.* at ¶ 65.) When Dillon was fired, she had "a lot of financial obligations, a child to support and no income to rely [on]." (*Id.*) She "could not afford to see any doctors because [she] did not have insurance and . . . had no money to pay out of pocket." (*Id.*) After intermittent periods of unemployment, in October 2013, Dillon obtained gainful employment at Medical Arts Health and Aesthetics, making $12 per hour—significantly less than the $17.50 per hour she was earning at Ned Management prior to her being sacked. (*Id.* at ¶¶ 52–64; E. Vainer Dep. Tr. 123:23.)

### III.    Summary Judgment Standard

Summary judgment will be granted when it is shown that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "No genuine issue exists if, on the basis of all the pleadings, affidavits and other papers on file, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, it appears that the evidence supporting the non-movant's case is so scant that a rational jury could not find in its favor."  *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996) (reversing grant of summary judgment in gender discrimination case).

Summary judgment is inappropriate when the admissible materials in the record "make it arguable" that the claim has merit.  *See, e.g.*, *In re Dana Corp.*, 574 F.3d 129, 151 (2d Cir. 2009) (citations omitted).  The Court of Appeals for the Second Circuit has "repeatedly expressed the need for caution [in] granting summary judgment to an employer in a discrimination case where . . . the merits turn on a dispute as to the employer's intent."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (vacating grant of summary judgment in racial discrimination case, explaining that "[w]here an employer has acted with discriminatory intent, direct evidence of that intent will only rarely be available, so that 'affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination'" (citation omitted)).  *See also, e.g.*, *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846–47 (2d Cir. 2013) (holding that genuine issue of material fact existed as to whether employer's stated reasons for terminating employee were pretextual, precluding summary judgment of employee's retaliation claims under Title VII and NYCHRL).

It is axiomatic that "[w]here an issue as to a material fact cannot be resolved without observation of the demeanor of [critical] witnesses in order to evaluate their credibility, summary

judgment is not appropriate." *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 174, 182 (2d Cir. 2012)

(quoting Fed. R. Civ. P. 56(e) Advisory Committee Note (1963)) (precluding summary judgment

in employee's sexual harassment action against employer because genuine issue of material fact

existed as to whether supervisor's touching of employee's breasts was sufficiently severe or

pervasive to alter conditions of alleged victim's employment). "Credibility determinations, the

weighing of the evidence, and the drawing of legitimate inferences from the facts are jury

functions, not those of a judge." *Id.* (quoting *Reeves v. Sanderson Plumbing Products, Inc.*, 530

U.S. 133, 150 (2000) (internal quotation marks and citation omitted)).

## IV. Law

### A. Applicable Statutes and Rules of Construction

#### 1. Title VII

Title VII of the Civil Rights Act of 1964 prohibits sexual harassment, rooted in gender

discrimination. *Karibian v. Columbia Univ.*, 14 F.3d 773, 777 (2d Cir. 1994) ("[S]exual

harassment in the workplace violates 'Title VII's broad rule of workplace equality.'" (quoting

*Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 23 (1993))); *Meritor Savings Bank*, *FSB v. Vinson*, 477

U.S. 57, 64–66 (1986) ("Without question, when a supervisor sexually harasses a subordinate

because of the subordinate's sex, that supervisor 'discriminates' on the basis of sex.").

"Individuals are not subject to liability under Title VII." *See, e.g.*, *Sassaman v.

Gamache*, 566 F.3d 307, 315–16 (2d Cir. 2009) (affirming dismissal of Title VII gender

discrimination claim against individual defendant).

In pertinent part, Title VII reads:

> It shall be an unlawful employment practice for an employer . . . to
> discriminate against any individual with respect to [her]
> compensation, terms, conditions, or privileges of employment,
> because of such individual's . . . sex.

42 U.S.C.A. § 2000e–2(a)(1) (West 2012).

The Title VII clause prohibiting retaliation for voicing opposition to discriminatory treatment states:

> It shall be an unlawful employment practice for an employer . . . to . . . discriminate against any of his employees. . . because [s]he has made a charge . . . under this subchapter.

42 U.S.C.A. § 2000e–3(a) (West 2012).  The Supreme Court has emphasized that retaliation, if tolerated, would prevent employees from protecting their rights against discrimination:

> If it were clear law that an employee who reported discrimination . . . could be penalized with no remedy, prudent employees would have a good reason to keep quiet about [discrimination] offenses against themselves or against others.  This is no imaginary horrible given the documented indications that fear of retaliation is the leading reason why people stay silent instead of voicing their concerns about bias and discrimination. . . . Nothing in the statute's text or our precedent supports this catch–22.

*Crawford v. Metro. Gov't of Nashville*, 555 U.S. 271, 279 (2009) (internal quotation marks and citations omitted).

## 2. **NYCHRL**

NYCHRL is no longer construed to be coextensive with its federal and state counterparts. *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 108–09 (2d Cir. 2013) (considering NYCHRL claims separately from Title VII claims in reversing summary judgment). In 2005, the New York City Council amended NYCHRL by passing the Local Civil Rights Restoration Act of 2005 (the "Restoration Act").  *See* N.Y.C. Local L. No. 85; *Loeffler v. Staten Island University Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009) (explaining that NYCHRL claims require independent analysis even if state and federal laws contain comparable language). Unlike under Title VII, individual defendants are subject to liability under NYCHRL.  *See e.g.*,

*Feingold v. N.Y.*, 366 F.3d. 138, 158–59 (2d Cir. 2004) (finding triable question of fact as to whether each individual defendant participated in discriminatory conduct).

The City's Restoration Act established two new rules of construction. *First*, it created a "one-way ratchet," by which interpretations of state and federal civil rights statutes serve only "as a floor below which the City's . . . law cannot fall." *Mihalik*, 715 F.3d at 109. *Second*, it amended NYCHRL to require that its provisions "be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws, including those laws with provisions comparably-worded to provisions of this title have been so construed." Restoration Act § 7 (amending N.Y.C. Admin. Code § 8-130). NYCHRL is designed to be more lenient toward plaintiffs than its federal and state equivalents. *Rozenfeld v. Dep't of Design & Constr. of City of N.Y.*, 875 F. Supp. 2d 189, 209 (E.D.N.Y. 2012) ("The [NY]CHRL was intended to be more protective than the state and federal counterpart, and thus the standard for maintaining a hostile work environment claim is lower under the [NY]CHRL.") (internal quotations and citations omitted).

When challenged conduct is not actionable under federal law, federal courts consider separately whether it is actionable under the broader NYCHRL standards. *Mihalik*, 715 F.3d at 109 (finding NYCHRL claims are not easily disposed of, even when Title VII and state human rights law claims are dismissed). According to the Court of Appeals for the Second Circuit, federal courts are now to be guided by the following principles in assessing NYCHRL claims:

> (1) NYCHRL claims must be analyzed separately and independently from federal and state discrimination claims;

> (2) the totality of the circumstances must be considered because the overall context in which the challenged conduct occurs cannot be ignored;

(3) the federal severe or pervasive standard of liability no longer applies to NYCHRL claims, and the severity or pervasiveness of conduct is relevant only to the scope of damages;

(4) the NYCHRL is not a general civility code, and a defendant is not liable if the plaintiff fails to prove the conduct is caused at least in part by discriminatory or retaliatory motives, or if the defendant proves the conduct was nothing more than petty slights or trivial inconveniences;

(5) while courts may still dismiss truly insubstantial cases, even a single comment may be actionable in the proper context; and

(6) summary judgment is still appropriate in NYCHRL cases, *but only* if the record establishes as a matter of law that a reasonable jury could not find the employer liable under any theory.

*Id.* at 113 (emphasis added) (internal quotation marks and citations omitted).

Subject to these rules of construction, section 8-107(1)(a) of NYCHRL makes it "an unlawful discriminatory practice" for "an employer or an employee or agent thereof, because of the . . . gender . . . of any person, . . . to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment."  N.Y.C. Admin. Code § 8-107(1)(a).

Section 8-107(7) prohibits "any person" from retaliating or discriminating "in any manner against any person because such person has . . . opposed any practice forbidden under this chapter."  *Id.* at § 8-107(7).  The Restoration Act amended this section to provide that retaliation should not be allowed to discourage complaints against discrimination:

> The retaliation or discrimination complained of under this subdivision need not result in an ultimate action with respect to employment, . . . or in a materially adverse change in the terms and conditions of employment, . . . provided, however, that the retaliatory or discriminatory act or acts complained of must be reasonably likely to deter a person from engaging in protected activity [complaining against discrimination].

Restoration Act § 3 (amending N.Y.C. Admin. Code § 8-107(7)).

NYCHRL additionally proscribes aiding and abetting discrimination and aiding and abetting retaliation against employees who oppose discriminatory practices. N.Y.C. Admin. Code § 8-107(6) ("It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter, or to attempt to do so.").

## B. Hostile Work Environment

### 1. Title VII

Plaintiff's sexual assault claim is advanced under a hostile work environment theory. (Pl. Mem. in Opp. to Mot. for Summ. J. 13, ECF No. 58.) *See also, e.g.*, *Torres v. Pisano*, 116 F.3d 625, 630 (2d Cir. 1997) ("It is now accepted that [the] language [of Title VII] evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment and to forbid sexual harassment in the workplace.") (internal quotation marks and citation omitted); *Carrero v. N.Y.C. Housing Auth.*, 890 F.2d 569, 578 (2d Cir. 1989) ("A female employee need not subject herself to an extended period of demeaning and degrading provocation before being entitled to seek the remedies provided under Title VII.").

To state an actionable hostile work environment claim, plaintiff must establish two elements. *First*, that "the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997) (internal quotation marks and citations omitted); *Atkins v. Pitney Bowes Mgmt. Servs.*, No. 12-CV-5575, 2015 WL 144158, at *8 (S.D.N.Y. Jan. 12, 2015) (same). *Second*, "a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Id.*

### a. Severity or Pervasiveness of Harassment

Under the first element, plaintiff must establish that the harassing conduct was "severe *or* pervasive"—not severe *and* pervasive. *Pa. State Police v. Suders*, 542 U.S. 129, 146 (2004) (emphasis added) (discussing Title VII's deterrent purpose in encouraging employees to report harassing conduct before it becomes severe or pervasive). The standard is disjunctive. *Id.* "[T]he misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002). *See also Harris*, 510 U.S. at 21 (holding that, as to the first element of a hostile work environment claim, sexually discriminatory verbal intimidation, ridicule, and insults may be sufficiently severe or pervasive to alter the conditions of a victim's employment in violation of Title VII).

"The objective hostility of a work environment depends on the totality of the circumstances," viewed from the perspective "of a reasonable person in the plaintiff's position, considering all the circumstances [including] the social context in which particular behavior occurs and is experienced by its target." *Petrosino v. Bell Atl.*, 385 F.3d 210, 221 (2d Cir. 2004) (internal quotation marks and citation omitted) (finding that "a reasonable jury could conclude that the persistent sexually offensive remarks . . . and the graffiti at outdoor work sites were particularly insulting to women because these actions cast women in a demeaning role"). "[T]he kinds of workplace conduct that may be actionable under Title VII . . . include unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature." *Meritor*, 477 U.S. at 65 (internal quotation marks and citation omitted). "When entering a workplace, reasonable people expect to have their autonomy circumscribed in a

number of ways; but giving up control over who can touch their bodies is usually not one of them."  *Redd*, 678 F.3d at 179.

A single incident of contact with an intimate body part is sufficient to establish a hostile work environment claim.  *See Reid v. Ingerman Smith LLP*, 876 F. Supp. 2d 176, 185 (E.D.N.Y. 2012) (holding that single incident where employee's supervisor allegedly grabbed her breast and commented that her breasts were large was sufficiently severe to constitute a hostile work environment).  "Direct contact with an intimate body part constitutes one of the most severe forms of sexual harassment."  *Redd*, 678 F.3d at 177.  *See also Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000) (finding that a single incident of verbal abuse was sufficient to raise questions of fact warranting reversal of grant of summary judgment on hostile work environment claim).  "[T]here is neither a threshold magic number of harassing incidents that gives rise, without more, to liability as a matter of law, nor a number of incidents below which a plaintiff fails as a matter of law to state a claim."  *Id.* at 154 (citations omitted).  *See also Redd*, 678 F.3d at 180 (finding that three incidents of touching over a five month period constituted evidence of purposeful harassment).

### b.  Imputing Conduct That Created Hostile Work Environment to Employer

To satisfy the second element of the test, plaintiff must establish "a specific basis . . . for imputing the conduct that created the hostile environment to the employer."  *Perry*, 115 F.3d at 149.  Central to this inquiry is the status of the harasser.  Where he is a "supervisor," an employer may be vicariously liable for his unlawful conduct.  *Vance v. Ball State Univ.*, 133 S. Ct. 2439, 2443 (2013).

An employee is a "supervisor" if he is empowered "to take tangible employment actions against the victim, *i.e.*, to effect a 'significant change in employment status, such as hiring,

firing, failing to promote, reassignment with significantly different responsibilities, or a decision

causing a significant change in benefits.'" *Id*. at 2443, 2451–52 (citation omitted) (holding that

juries should be instructed that the nature and degree of authority wielded by the harasser is an

important factor to be considered in determining whether the employer was negligent).  The

Supreme Court recognizes that the definition of supervisor is a fluid concept:  "Particularly in

modern organizations that have abandoned a highly hierarchical management structure, it is

common for employees to have overlapping authority with respect to the assignment of work

tasks." *Id*. at 2452.

### c.  Affirmative Defense

"If the harassing employee is the victim's coworker, the employer is liable only if it was

negligent in controlling working conditions." *Id*. at 2439.  The employer is not liable unless it

either (1) provided no reasonable avenue for complaint, or (2) knew of the harassment and did

nothing about it.  *See, e.g.*, *Perry*, 115 F.3d at 149.  To take advantage of this affirmative

defense—*i.e.*, the *Faragher/Ellerth* defense—the employer must show that it "exercised

reasonable care to prevent and correct promptly any sexually harassing behavior," and that "the

plaintiff employee unreasonably failed to take advantage of any preventive or corrective

opportunities provided by the employer or to avoid harm otherwise." *Townsend v. Benjamin

Enters., Inc.*, 679 F.3d 41, 50 (2d Cir. 2012) (citing *Faragher v. City of Boca Raton*, 524 U.S.

775, 807 (1998) and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998)). *See also

Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 103 n. 3 (2d Cir. 2010) (finding that even if

defendant could raise the *Faragher/Ellerth* defense at summary judgment stage, defense could

fail); *Redd*, 678 F.3d at 183 (finding disputed issues of fact regarding the validity of

*Faragher/Ellerth* defense precluded summary judgment).

## 2. NYCHRL

Applying the Restoration Act's new rules of construction, *see supra* Part IV.A.2, "forcing a targeted employee to suffer unwanted gender-based conduct imposes a different term or condition of employment on her, even if the harassing conduct does not rise to the level of being severe and pervasive." *Mihalik*, 715 F.3d at 110 (internal quotation marks and citation omitted). "To establish a gender discrimination claim under the NYCHRL, the plaintiff need only demonstrate by a preponderance of the evidence that she has been treated less well than other employees because of her gender"—*i.e.*, that she has been subjected to differential treatment. *Id.* (internal quotation marks and citation omitted). The federal "severe or pervasive" standard is not used under NYCHRL. *Id.* at 114. Plaintiff nonetheless has the burden of showing that the gender-based conduct complained of was caused by a discriminatory motive; "it is not enough that a plaintiff has an overbearing or obnoxious boss." *Id.* at 110. Under the NYCHRL standard, the conduct's severity or pervasiveness is relevant only to the issue of damages. *Id.* at 110, 113.

Defendants may assert "an affirmative defense whereby they can still avoid liability if they prove that the conduct complained of consists of nothing more than what a reasonable victim of discrimination would consider 'petty slights and trivial inconveniences.'" *Id.* at 111 (internal quotation marks and citation omitted). *See also Melman v. Montefiore Med. Ctr.*, 946 N.Y.S. 2d 27, 44 (App. Div. [1st Dep't] 2012) ("[E]ven after the passage of the [Restoration Act], not every plaintiff asserting a discrimination claim will be entitled to reach a jury.") "[T]he overall context in which [the challenged conduct occurs] cannot be ignored." *Hernandez v. Kaisman*, 957 N.Y.S.2d 53, 59 (App. Div. [1st Dep't] 2012). Even "a single comment that objectifies women . . . made in circumstances where that comment would, for example, signal

views about the role of women in the workplace [may] be actionable."  *Williams v. N.Y.C. Hous.*

*Auth.*, 872 N.Y.S.2d 27, 41 n. 30 (App. Div. [1st Dep't] 2009).

### a.  Direct Liability of Employer

Under NYCHRL, an employer is strictly liable for the unlawful harassment of employees

by their supervisors or managers, regardless of whether the harassment culminates in a tangible

employment action.  *Zakrzewska v. New Sch.*, 14 N.Y.3d 469, 473, 476–77 (2010).  The New

York Court of Appeals holds:  "The plain language of [section] 8-107 . . . creates vicarious

liability for the acts of managerial and supervisory employees even where the employer has

exercised reasonable care to prevent and correct any discriminatory actions and even where the

aggrieved employee unreasonably has failed to take advantage of employer-offered corrective

opportunities."  *Id.* at 478.  *See also* N.Y.C. Admin. Code § 8-107(13)(b)(1)("An employer shall

be liable for an unlawful discriminatory practice based upon the conduct of an employee . . .

where the employee or agent exercised managerial or supervisory responsibility.").

### b.  Direct Liability of Individual Employees

Section 8-107(1)(a) of NYCHRL makes it unlawful "for an employer or *an employee or*

*agent thereof*" to create a hostile work environment.  N.Y.C. Admin. Code § 8–107(1)(a)

(emphasis added).  Individual employees may be held liable under NYCHRL if they actually

participated in the conduct giving rise to the discrimination claim.  *Britt v. Merrill Lynch & Co.*,

No. 08-CV-5356, 2011 WL 4000992, at *11 (S.D.N.Y. Aug. 26, 2011) (internal quotation marks

and citation omitted); *Loeffler*, 582 F.3d at 278 (affirming that NYCHRL permits "associational

discrimination claims" under its broad interpretation).  In order to hold an individual defendant

liable for creating a hostile work environment under NYCHRL, evidence must show that the

claim relates directly to the conduct and behavior of the individual.  *See Cid v. ASA Inst. of Bus.*

*& Comp. Tech., Inc.*, No. 12-CV-2947, 2013 WL 1193056, at *1–2, *5 (E.D.N.Y. Mar. 22, 2013) (denying dismissal of hostile work environment claims under NYCHRL against defendant supervisor who allegedly offered plaintiff employee gifts he sought to have kept secret from other supervisors, and stood over employee and made comments such as "you are beautiful," "you are a tall and beautiful woman," and "those women having nothing on you."); *Arena v. Agip USA, Inc.*, No. 95-CV-1529, 2000 WL 264312, at *4 (S.D.N.Y. 2000) (finding that because defendant's "unremitting harassment drove [plaintiff's] stress levels high . . . a reasonable jury could conclude that [defendant] participated in . . . harassment").

### c. Aider and Abettor Liability

Section 8-107(6) of NYCHRL provides for aider and abettor liability. *See supra* Part IV.A.1.b. But, "before an individual may be considered an aider and abettor," liability "must first be established as to the employer." *Sowemimo v. D.A.O.R. Sec., Inc.*, 43 F. Supp. 2d 477, 490–91 (granting summary judgment in favor of perpetrator of racial comments because no liability was established as to employer). *See also Aiossa v. Bank of America, N.A.*, No. 10-CV-1275, 2012 WL 4344183, at *5 (E.D.N.Y. Sept. 21, 2012) (same)*; DeWitt v. Liberman*, 48 F. Supp. 2d 280, 293 (S.D.N.Y. 1999) (same).

"[A]ider-and-abettor liability [under NYCHRL] may extend to supervisors who failed to investigate or take appropriate remedial measures despite being informed about the existence of alleged discriminatory conduct." *Morgan v. NYS Atty. Gen.'s Office*, No. 11-CV-9389, 2013 WL 491525, at *13 (S.D.N.Y. Feb. 08, 2013). *See also Anderson v. Davis Polk & Wardwell LLP*, 850 F. Supp. 2d 392, 404 (S.D.N.Y. 2012) (noting that "an employee may be held personally liable as an aider and abettor for failing to take remedial action in response to a complaint of sexual harassment") (citing *Patane*, 508 F.3d 106, 115 n. 7 (2d Cir. 2007)); *Regan v. Benchmark*

*Co. LLC*, 2012 WL 692056, No. 11-CV-4511, at *14 (S.D.N.Y. Mar.1, 2012) (finding that plaintiff sufficiently stated aiding and abetting claims under NYCHRL, based, in part, on allegation that individual managers "refused to take remedial action when [plaintiff] complained about discriminatory treatment").

Although no bright line rule has been enunciated explaining how direct liability for the creation of a hostile work environment differs from aiding and abetting the creation of such a climate, case law suggests that plaintiffs may bring both types of claims against individual defendants who fail to investigate or take remedial action in the face of a discrimination complaint. *See, e.g.*, *Cid*, 2013 WL 1193056, at *5–6 (holding that allegations that supervisors failed to investigate or take remedial action in response to plaintiff's complaints provided a sufficient basis for both a hostile work environment and aiding and abetting claims under NYCHRL).

## C. Retaliation

### 1. Title VII

The *McDonnell Douglas* burden-shifting framework applies to claims of retaliation under Title VII. *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 129 (2d Cir. 2012).

#### a. Plaintiff's Burden: Prima Facie Case

The Court of Appeals for the Second Circuit notes that establishing a prima facie case of retaliation places only a slight burden on plaintiff. It has described the first stage of the retaliation burden-shifting analysis as follows:

> First, the plaintiff must establish a prima facie case of retaliation by showing: (1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action. The plaintiff's burden in this regard is *de minimis*, and the court's role in evaluating a summary judgment request is to

determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive.

*Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (internal quotation marks and citations omitted).

### i.   Engagement in Protected Activity

"The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination," *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000), *superseded by statute on other grounds by* N.Y.C. Local L. No. 85, and may take the form of either formal or informal complaints, *Conway v. Microsoft Corp.*, 414 F. Supp. 2d 450, 466 (S.D.N.Y. 2006).  The Court of Appeals for the Second Circuit "has recognized that protected activity includes informal protests of discriminatory employment practices, including making complaints to management."  *Benedith v. Malverne Union Free Sch. Dist.*, No. 11-CV-5964, 2014 WL 4056554, at *29 (E.D.N.Y. Aug. 15, 2014) (internal quotation marks and citations omitted),

### ii.   Employer's Awareness of Protected Activity

"[I]nformal complaints must be sufficiently specific to make it clear that the employee is complaining about conduct prohibited by . . . law." *Id.*  "[I]mplicit in the requirement that the employer [was] aware of the protected activity is the requirement that [the employer] understood, or could reasonably have understood, that the plaintiff's opposition was directed at [prohibited] conduct." *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998). "[P]articular words such as 'discrimination' are certainly not required to put an employer on notice of a protected complaint." *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 17 (2d Cir. 2010).

The Supreme Court recognizes that opposition can be manifested subtly—without uttering a firm "no":

> "Oppose" goes beyond "active, consistent" behavior in ordinary discourse, where we would naturally use the word to speak of someone who has taken no action at all to advance a position beyond disclosing it. Countless people were known to "oppose" slavery before Emancipation, or are said to "oppose" capital punishment today, without writing public letters, taking to the streets, or resisting the government. And we would call it "opposition" if an employee took a stand against an employer's discriminatory practices not by "instigating" action, but by standing pat, say, by refusing to follow a supervisor's order to fire a junior worker for discriminatory reasons.

*Crawford*, 555 U.S. at 277 (reversing grant of summary judgment where plaintiff was terminated following verbal complaints to supervisors about sexually explicit comments made in the workplace).

### iii. Adverse Employment Action

The term "adverse employment action" refers to one or more actions that change the terms and conditions of an individual's employment. *See, e.g.*, *Beyer v. Cnty. of Nassau*, 524 F.3d 160, 163–65 (2d Cir. 2008). Termination of employment satisfies the third prong of the prima facie retaliation test. *See, e.g.*, *Lewis v. N.Y.C. Transit Auth.*, No. 04-CV-2331, 2014 WL 1343248, at *15 (E.D.N.Y. Mar. 31, 2014) (holding that an "adverse employment action" includes "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation" (citing *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000))).

### iv. Causal Connection Between Adverse Action and Protected Activity

Proof of causation can be shown indirectly. *Hicks*, 593 F.3d at 170 (internal quotation marks and citation omitted). A plaintiff can succeed "by showing that the protected activity was followed closely by discriminatory treatment." *Id.* Up to a seven-month gap between protected activity and an adverse employment action is "not prohibitively remote." *Summa v. Hofstra Univ.*, 708 F.3d 115, 128 (2d Cir. 2013). *See also Gorzynski*, 596 F.3d at 110 ("[W]e have previously held that five months is not too long to find the causal relationship."). Courts "have not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) (internal quotation marks and citation omitted).

### b. Employer's Burden: Non-Retaliatory Reason for Employment Action

"Once the plaintiff has established a prima facie showing of retaliation, the burden shifts to the employer to articulate some legitimate, non-retaliatory reason for the employment action." *Kwan*, 737 F.3d at 845. After the defendant does so, "the presumption of retaliation arising from the establishment of the prima facie case drops from the picture." *Id.* "Federal courts do not have a 'roving commission to review business judgments,' and may not 'sit as super personnel departments, assessing the merits—or even the rationality—of employers' non-discriminatory business decisions.'" *Greene v. Brentwood Union Free Sch. Dist.*, 966 F. Supp. 2d 131, 156 (E.D.N.Y. 2013) (citations omitted).

### c.  Plaintiff's Renewed Burden:  Assessing Whether Employer's Stated Reason is Pretextual

In order to successfully rebut an employer's purported non-discriminatory reason for the employment action, a plaintiff must establish pretext.  *Kwan*, 737 F.3d at 845.  Retaliation must be shown as the "but-for" cause of the adverse action.  *Id.*  The standard for establishing pretext is summarized as follows:

> [A] plaintiff alleging retaliation in violation of Title VII must show that retaliation was a "but-for" cause of the adverse action, and not simply a "substantial" or "motivating" factor in the employer's decision.  However, "but-for" causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive.
>
> A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action.

*Id.* at 845–46 (citations omitted).

### 2.  NYCHRL

Retaliation claims under NYCHRL are analyzed under the same burden-shifting framework established by the Supreme Court in *McDonnell Douglas*.  *Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 361–62 (S.D.N.Y. 2012) (citation omitted); *see supra* Part IV.C.1.  They are, however, reviewed "independently from and 'more liberally' than" federal law claims.  *Loeffler,* 582 F.3d at 278.  In contrast to Title VII, NYCHRL does not require a plaintiff to establish that she incurred an "adverse employment action" in order to support a retaliation claim; rather, it requires only a showing that the event was "reasonably likely to deter a person from engaging in protected activity."  *See Rozenfeld*, 875 F. Supp. 2d at 208.  New York courts broadly interpret NYCHRL's retaliation provisions.  *See Mihalik*, 715

F.3d at109; *Schanfield v. Sojitz Corp. of Am.*, 663 F. Supp. 2d 305, 343 (S.D.N.Y. 2009) (finding

that "any manner" of retaliation is illegal under NYCHRL after the issue of discrimination is

brought to the attention of management, such as excluding an employee from meetings, refusing

to provide a necessary translator for employee to conduct business, or excessive supervision).

### a. Direct Liability of Employer

To prevail on a retaliation claim against an employer under NYCHRL section 8-107(7), a

plaintiff must show that, because she opposed discrimination, her employer engaged in conduct

that was reasonably likely to deter another person from engaging in protected activity. *Williams*,

872 N.Y.S. 2d at 34. The New York Court of Appeals has held that "oppos[ing] any practice"

can include situations where a person, before the retaliatory conduct occurred, merely "made

clear her disapproval of [the defendant's] discrimination by communicating to [him or her], in

substance, that she thought [his or her] treatment of [the victim] was wrong." *Albunio v. City of

N.Y.*, 16 N.Y. 3d 472, 479 (2011).

Claims against an employer survive summary judgment where the employer, "knowingly

or not," may have terminated plaintiff "*because of* discriminatory or retaliatory intent." *Malena*,

886 F. Supp. 2d at 366 (emphasis in original). *See also Cid*, 2013 WL 1193056, at *8–9

(holding that plaintiff stated plausible retaliation claim against her employer based on evidence

that her work hours were reduced and that she was transferred to another position after she

reported unwanted sexual advances by her supervisor). Assessing a retaliation claim should "be

made with a keen sense of workplace realities, of the fact that the 'chilling effect' of particular

conduct is context-dependent, and of the fact that a jury is generally best suited to evaluate the

impact of retaliatory conduct." *Williams*, 872 N.Y.S.2d at 34.

### b. Direct Liability of Individual Employees

Individual employees who "actually participate[d] in the conduct giving rise to" the plaintiff's claim may be found liable for retaliation under NYCHRL. *Hozer v. Pratt Indus. (USA), Inc.*, No. 10-CV-3874, 2012 WL 2049498, at *1 n. 1 (E.D.N.Y. June 6, 2012) (quoting *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 107 n. 10 (2d Cir. 2011)). To prevail on a retaliation claim under NYCHRL against an individual defendant, a plaintiff must show that defendant actually engaged in the retaliatory activity. *Malena*, 886 F. Supp. 2d at 366–67 (denying partial summary judgment in light of evidence that an individual defendant "suppl[ied] the intent and the complaints that may have led to [p]laintiff's termination."). An individual employee, even without supervisory authority, may be liable for retaliation under NYCHRL "regardless of ownership or decisionmaking power." *Id.* at 366 (citation omitted). *See also Cid*, 2013 WL 1193056, at *8 (permitting direct retaliation claims against individual employees based on alleged participation in retaliation).

### c. Aider and Abettor Liability

Aiding and abetting retaliatory activity is punishable pursuant to sections 8-107(6) and 8-107(7). *See Cid*, 2013 WL 1193056, at *8. A plaintiff seeking to bring an aiding and abetting claim for retaliation must demonstrate that individual defendants were involved, or participated in, retaliation following a plaintiff's disclosure of sexual harassment. *Malena*, 886 F. Supp. 2d at 367–68 (denying summary judgment against individual defendant who had authority to reassign employees, as defendant may have potentially "aid[ed], abet[ted], [or] incite[d]" discrimination and retaliation); *Cid.*, 2013 WL 1193056, at *9 (permitting aiding and abetting claim against individual employees based on alleged participation in the retaliation); *Regan v. Benchmark Co. LLC*, No. 11-CV-4511, 2012 WL 692056, at *14 (S.D.N.Y. Mar. 1, 2012) (refusing to dismiss

aiding and abetting claim against individual defendants based on plaintiff's allegations, which included her claim that defendants refused to take remedial action and transferred plaintiff out of state); *Lyman v. N.Y. Presbyterian Hosp.*, No. 11-CV-3889, 2014 WL 3417394, at *20–21 (S.D.N.Y. July 14, 2014) (finding that defendant's sworn affidavit that she decided to terminate plaintiff's employment and told plaintiff that she was being fired was sufficient evidence to deny summary judgment on plaintiff's aiding and abetting retaliation claim). *See also Chapkines v. N.Y. Univ.*, No. 02-CV-6355, 2004 U.S. Dist. LEXIS 2990, at *15–16 (S.D.N.Y. Feb. 25, 2004) (finding that individual defendant participated in retaliatory termination by signing and sending a letter stating that the decision to terminate plaintiff was "within appropriate bounds," and recommending that plaintiff "not be reappointed").

The difference between aider and abettor liability for retaliation and direct liability for retaliation under NYCHRL is unclear. Courts have allowed both claims against individual defendants to proceed to trial in tandem. *See, e.g.*, *Malena*, 886 F. Supp. 2d at 367 (refusing to grant summary judgment in favor of individual defendant on direct retaliation and aiding and abetting claims); *Lyman*, 2014 WL 3417394, at *21 (same); *Cid*, 2013 WL 1193056, at *8–9 (declining dismissal of plaintiff's NYCHRL retaliation and aiding and abetting claims against individual defendants who reprimanded plaintiff without basis and threatened to have her fired prior to her termination).

V.      **Application of Law to Facts**

A.  **Hostile Work Environment**

1.  **Title VII Claim against Defendant Ned Management**

Plaintiff states an actionable hostile work environment claim against Ned Management. *See supra* Part IV.B.1. *First*, viewing the record as a whole in the light most favorable to her, the

harassment she endured was sufficiently severe, altering the conditions of her working environment. *See generally supra* Parts II & IV.B.1.a. Twice, Fridman made demeaning sexual proposals to plaintiff with money. *Id.* A third time, while both were engaged in doing work for Ned Management, he made direct contact with an intimate part of her body: her buttock. *Id.* This single incident of contact is sufficient to constitute the creation of a hostile work environment. *See supra* Part IV.B.1.a. Evidence has also been proffered suggesting that Fridman harassed Dillon's female coworker. *See supra* Part II.C. Although defendants deny Dillon's allegations, a decision about which version of events to credit is one to be made by the fact finder at trial, not by the court as a matter of law. *See supra* Part III.

*Second*, Dillon can impute Fridman's conduct to her employer. *See supra* Part IV.B.1.b. The harasser, Fridman, arguably possessed and exercised supervisory power over plaintiff. *See supra* Part II.B. The evidence shows that Fridman, stepfather to Mr. Vainer and common-law husband to Mrs. Vainer, could take tangible employment actions against Ned Management employees; he controlled the delivery of paychecks and expected employees to obey his job-related requests. *Id.* As this court noted in denying defendants' motion to dismiss: "[A] jury could reasonably find that the marital relationship [between Fridman and Mrs. Vainer] included a strong influence by the husband on his wife and her son, the owner of the family company, equivalent to supervisory power." *Dillon v. Ned Management, Inc.*, No. 13–CV–2622, 2014 WL 583234, at *3 (E.D.N.Y. Feb. 12, 2014).

*Third*, Ned Management cannot avail itself of the *Faragher/Ellerth* defense. *See supra* Part IV.B.1.c. Even if the court accepts, which it does not for purposes of the present motion, that Fridman was not a supervisor, Mr. Vainer's thirty minute, apparently incomplete, and possibly biased investigation, the existence of which has been put into question by his

codefendants Mrs. Vainer and Milligan, suggests that the owner of Ned Management knew about the harassment and did nothing about the civil rights violation. *See supra* Part II.D & E.

The Title VII hostile work environment claim against defendant Ned Management will be tried.

### 2. NYCHRL Claims against Defendant Ned Management and Individual Defendants

#### a. Direct Liability against Defendant Ned Management

"[T]o the extent that [a corporate] defendant has failed to show it is entitled to summary judgment under [Title VII], it would not be entitled to summary judgment under the more expansive standard of the NYCHRL." *Kwan*, 737 F.3d at 843 n.3 (citing *Williams v. Regus Mgmt. Grp., LLC*, 836 F.Supp.2d 159, 181 (S.D.N.Y. 2011). *See also supra* Part IV.B.2.a.

The motion for summary judgment regarding the NYCHRL hostile environment claim against Ned Management is denied.

#### b. Direct Liability against Individual Defendants

Plaintiff has presented sufficient evidence suggesting that questions of material fact exist regarding the individual defendants' participation in events giving rise to the creation of a hostile work environment at Ned Management. *See generally supra* Parts II & IV.B.2.c. Fridman's alleged sexual harassment, Mrs. Vainer's order to dock Dillon's pay, and Milligan and Mr. Vainer's failure to take remedial action once Dillon complained of Fridman's unwanted advances could lead a jury to reasonably conclude that each individual defendant was directly involved in the creation of a hostile work environment. *Id*.

Plaintiff's NYCHRL hostile work environment claims against each individual defendant will be tried.

### c. Aider and Abettor Liability against Individual Defendants

An aiding and abetting hostile work environment claim stands against Fridman, the Vainers, and Milligan because each had power to do more than carry out personnel decisions made by others. *See supra* Part IV.B.2.c. When plaintiff reported the harassment by Fridman to Milligan and Mr. Vainer, she was, a jury could find, berated and retaliated against. *See supra* Part II.D *et seq*. Mrs. Vainer docked Dillon's pay and, within days of Dillon's verbal complaint about her treatment at the hands of Fridman, she was fired. *Id*. Failing to conduct an adequate investigation of Dillon's sexual harassment complaint, effectively ignoring her and suspiciously docking her pay for the day she was grabbed by Fridman, if proved at trial, would support Dillon's sex discrimination claim against the Vainers and Milligan. *Id*.

Individual defendants' motion for summary judgment regarding the aiding and abetting hostile work environment claims under NYCHRL is denied.

## B. Retaliation

### 1. Title VII Claim against Defendant Ned Management

Plaintiff has established a prima facie showing of retaliation and sufficiently alleged pretext against Ned Management. *See supra* Part IV.C.1. *First*, plaintiff engaged in protected activity when she complained to defendants Milligan and Mr. Vainer about Fridman's behavior. *See supra* Parts II.D & V.C.1.a.i. *Second*, her employer, Ned Management, was aware of Dillon's engagement in protected activity because she manifested her opposition to Fridman's sexual harassment by verbal complaint to Mr. Vainer, the owner of the company. *See supra* Parts II.D & V.C.1.a.ii. *Third*, the docking of plaintiff's pay without clear explanation and her termination without warning can each be considered adverse employment actions. *See supra* Parts II.F-G & V.C.1.a.iii. *Fourth*, a causal temporal connection exists between these adverse

actions and Dillon's complaint. *See supra* Parts II.F-G & V.C.1.a.iv. Plaintiff's pay was docked on the same day she told Vainer about the sexual harassment; and, on October 10, 2012, nine days after making her complaint, she was terminated. *Id.* These actions were taken within sufficient proximity of Dillon's complaint of sexual harassment to be considered causative. *Id.*

Ned Management does not argue that plaintiff fails to satisfy a prima facie showing of retaliation. Instead, it contends that Dillon's retaliation claim should be dismissed because defendants had a legitimate non-retaliatory reason for terminating her employment: "excessive lateness." (Defs.' Mem. of Law in Supp. of Mot. Summ. J. 10, ECF No. 53; Defs.' Reply Mem. of Law in Supp. of Mot. Summ. J 5–6, ECF No. 60.) They do not, however, address pretext.

Dillon satisfies her burden with respect to pretext. *See supra* Part IV.C.1.b. She demonstrated that there are questions of material fact regarding whether the reasons proffered for the docking of her pay and her ultimate termination were pretextual. *See supra* Part II.F-G. Putting aside the issue of whether plaintiff should have been paid for Columbus Day, defendants fail to offer any explanation as to why she was not paid for working the day Fridman grabbed her. *See supra* Part II.F. They fail to present credible evidence that Dillon had been informed before her date of termination that lateness was a problem. *See supra* Part II.G. Contradicting his boss, Milligan affirmed that Ned Management wrote-up employees for lateness but never did so with respect to Dillon. *Id.* Viewing the evidence, which primarily consists of contradictory deposition testimony, in the light most favorable to plaintiff, a jury could find in her favor. *See supra* Part III.

To be heeded is the warning of the Court of Appeals for the Second Circuit: There is a need for caution about granting summary judgment to an employer in a discrimination case where the merits of the case turn on a dispute as to the employer's intent. *Holcomb*, 521 F.3d at

137; *cf. Kwan*, 737 F.3d at 846 n.5 ("The determination of whether retaliation was a 'but-for' cause . . . is particularly poorly suited to disposition by summary judgment, because it requires weighing of the disputed facts, rather than a determination that there is no genuine dispute as to any material fact.")

The Title VII retaliation claim against defendant Ned Management will be tried.

### 2. NYCHRL Claims against Defendant Ned Management and Individual Defendants

#### a. Direct Liability against Defendant Ned Management

Because defendant Ned Management has failed to show that it is entitled to summary judgment under *McDonnell Douglas*, it is *a fortiori* not entitled to summary judgment under the more expansive NYCHRL standard. *Kwan*, 737 at 843 n.3 (citing *Williams*, 836 F.Supp.2d at 181). *See also supra* Parts IV.B.2.a & V.B.1. The Court of Appeals for the Second Circuit explained:

> [W]hile we agree that the evidence of [plaintiff's] poor performance was substantial, we also conclude that a jury could find, notwithstanding that poor performance, that [defendant] was not yet ready to fire [plaintiff] and that it did so only after [her supervisor] became angry that [plaintiff] raised the issue of his sexual advances. Moreover, because [her supervisor] had never criticized [plaintiff's] performance before she rejected his propositions, a jury could find that he used her shortcomings as an excuse to humiliate and punish her for opposing his discriminatory behavior. If a jury so found, it would be free to infer that [defendant] is using [plaintiff's] poor performance now as a mere cover-up for retaliation.

*Mihalik,* 715 F.3d at 117.

Ned Management's motion for summary judgment with respect to retaliation under NYCHRL is denied.

### b. Direct Liability against Individual Defendants

Plaintiff has provided sufficient evidence under NYCHRL to indicate that each individual defendant engaged in retaliatory activity. *See supra* Part V.B.2.b. In addition to the fact that Dillon's superiors largely ignored her sexual harassment complaint, evidence was presented that, as a group, the Vainers and Fridman punished plaintiff for opposing Fridman's discriminatory behavior. *See supra* Part II.F-G. The family operating this small business would, a jury could deduce, know what was happening in connection with one of its member's sexual peccadilloes; the evidence could support a finding that they joined to protect themselves by punishing plaintiff. Mr. Vainer fired plaintiff and Mrs. Vainer docked Dillon's pay. *Id*. A jury could find that the perpetrator of the alleged harassment, Fridman, influenced the retaliation engaged in by the company and the Vainers. *See supra* Parts II.B & IV.C.1.b.

At the summary judgment hearing, plaintiff withdrew her retaliation claim against Milligan. *See* Hr'g Tr. Jan. 23, 2015.

The NYCHRL retaliation claims against the Vainers and Fridman will be tried.

### c. Aider and Abettor Liability against Individual Defendants

An aiding and abetting claim can be brought against all individual defendants with respect to their alleged retaliatory activity. *See supra* Part IV.C.2.c. Plaintiffs are permitted to bring such a claim if the evidence presented shows that a question of material fact exists regarding defendants' participation in retaliatory conduct. *Id*. The circumstances of Dillon's termination, in conjunction with defendants' inconsistent testimony about the docking of plaintiff's pay, the investigation that was, or was not, conducted regarding the alleged sexual harassment, and the reason for plaintiff's firing, raise material questions of fact for a jury to consider. *See supra* Parts II.E-G & III.

Individual defendants' motion for summary judgment regarding the aiding and abetting retaliation claims under NYCHRL is denied.

**VI.     Conclusion**

Defendants' motion for summary judgment is denied.  The sexual assault and battery claim against Fridman stands since it was not substantively opposed by defendants in their papers or at the motion for summary judgment hearing.

In sum, the following defendants and claims will be tried:

(1) Ned Management shall be tried under Title VII and NYCHRL for allegedly:
 (a) creating a hostile work environment; and
 (b) retaliating against plaintiff.

(2) Mr. Fridman shall be tried under NYCHRL for allegedly:
 (a) creating a hostile work environment,
 (b) retaliating against plaintiff;
 (c) aiding and abetting the creation of a hostile work environment;
 (d) aiding and abetting the retaliatory actions taken against plaintiff; and
 (e) sexually harassing and battering plaintiff.

(3) Mr. Vainer shall be tried under NYCHRL for allegedly:
 (a) creating a hostile work environment,
 (b) retaliating against plaintiff;
 (c) aiding and abetting the creation of a hostile work environment; and
 (d) aiding and abetting the retaliatory actions taken against plaintiff.

(4) Mrs. Vainer shall be tried under NYCHRL for allegedly:
 (a) creating a hostile work environment,
 (b) retaliating against plaintiff;
 (c) aiding and abetting the creation of a hostile work environment; and
 (d) aiding and abetting the retaliatory actions taken against plaintiff.

(5) Mr. Milligan shall be tried under NYCHRL for allegedly:
  (a)     creating a hostile work environment; and
  (b)     aiding and abetting the creation of a hostile work
          environment.

Trial will start on March 23, 2015 at 2:00 p.m. A jury will be selected before a

magistrate judge, beginning at 9:30 a.m.

*In limine* motions will be heard on March 16, 2015 at 10:00 a.m.

By March 9, 2015, the parties shall submit to the court proposed jury charges and verdict

sheets, *in limine* motions, and any supporting briefs. They shall also exchange and file with the

court: (1) lists of pre-marked exhibits proposed for use at trial, together with copies of all

exhibits; (2) lists of potential witnesses together with brief summaries of proposed testimony;

and (3) stipulations with respect to all undisputed facts.

Any disputes related to briefing schedules or discovery are respectfully referred to the

magistrate judge.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Dated: January 30, 2015
Brooklyn, New York